UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FAIR ISAAC CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>PCI-U, LLC,<br><br>    Defendant. | Case No. 5:17-cv-03324-EJD<br><br>**ORDER DENYING MOTION TO DISMISS; GRANTING MOTION TO TRANSFER**<br><br>Re: Dkt. No. 10 |

## I. INTRODUCTION

Plaintiff Fair Isaac Corporation ("FICO") initiated this suit for breach of a nondisclosure agreement and for declaratory relief. Defendant PCI-U, LLC ("PCI-U") moves to dismiss the case for lack of personal jurisdiction, or in the alternative, to transfer the case to the U.S. District Court in the Northern District of Georgia pursuant to 28 U.S.C. §§1404(a) and 1406(a). FICO contends that PCI-U is subject to specific personal jurisdiction in this district and that venue is proper in this district and not in the Northern District of Georgia. The Court finds it appropriate to take the motion under submission for decision without oral argument pursuant to Civil Local Rule 7-1(b). For the reasons set forth below, PCI-U's motion to dismiss for lack of personal jurisdiction is denied and PCI-U's motion to transfer is granted.

## II. BACKGROUND

A. California Case: FICO v. PCI-U filed June 8, 2017

Plaintiff FICO, a Delaware corporation with its principal place of business in San Jose, California, is a leading analytics software company. Complaint at ¶1. FICO provides analytics software and tools across multiple industries to manage risk, fight fraud, optimize operations and

1
CASE NO.: 5:17-CV-03324-EJD
ORDER DENYING MOTION TO DISMISS;GRANTING MOTION TO TRANSFER

enhance business performance. Id.

Defendant PCI-U is a Georgia limited liability company with its principal place of business in Atlanta, Georgia. Id. at ¶3. FICO alleges on information and belief that PCI-U's members are all citizens of Georgia. Id. PCI-U is a fledgling company, organized in 2014, that developed a web-based service that permits small retailers to assess their compliance with credit card issuer contractual requirements through the use of an online questionnaire. Id. at ¶4.

Prior to May of 2015, FICO had allegedly been developing a software product referred to internally as "Merchant Inspector" that produces a set of scores that encapsulate a payment card merchant's fraud risk. Complaint at ¶7. FICO was allegedly testing its Merchant Inspector product and considering how to bring that product to market. Id. at ¶8.

FICO alleges that in May of 2015, PCI-U approached FICO representatives in California to discuss a potential joint marketing plan involving PCI-U's online questionnaire and another FICO fraud management software product known as FICO® Falcon® Fraud Manager. Id. at ¶9. FICO alleges that from the inception of the first contact by PCI-U, FICO informed PCI-U that it was already developing Merchant Inspector and believed PCI-U's questionnaire might be compatible with Merchant Inspector. Id.

In June of 2015, the parties entered into a Non-Disclosure Agreement ("NDA") in order to facilitate discussions concerning the potential joint marketing effort. Id. at ¶10. The NDA was allegedly "made" in California and is the only agreement ever made between FICO and PCI-U. Id. at ¶11. Following execution of the NDA, FICO allegedly disclosed confidential information, including information regarding Merchant Inspector. Id. at ¶12. Among other confidential information, FICO allegedly provided to PCI-U certain Power Point presentation slides that disclosed details concerning Merchant Inspector and other fraud management products. Id.

Between June of 2015 and January of 2016, representatives of FICO and PCI-U allegedly had numerous meetings in California to discuss their potential joint marketing effort. Id at ¶14. During the time period the parties were exchanging information and assessing the viability of a joint marketing effort, FICO allegedly partnered with a company known as iboss Cybersecurity

("iboss") in order to deploy certain cyber threat analytics developed by FICO. Id. at ¶15. These cyber threat analytics allegedly had nothing to do with any product developed by PCI-U. Id. Throughout the discussions, FICO allegedly made it clear to PCI-U that it was interested in developing additional general enterprise risk analytics to compliment the products it had already developed and intended to continue to do so independently of any of the matters being discussed with PCI-U. Id. at ¶16.

In June of 2016, FICO acquired a company known as QuadMetrics, a cyber risk security scoring company. Id. at ¶17. FICO alleges on information and belief that PCI-U believes that FICO had an obligation to partner only with PCI-U with respect to all cyber-risk analytics, and that FICO's development and deployment of its cyber threat analytics through iboss and its acquisition of QuadMetrics were unlawful. Id. at ¶18. FICO denies that its development of cyber analytics through iboss was unlawful. Id. FICO also denies that its acquisition of QuadMetrics was unlawful. Id.

In 2016, FICO released an analytic product known as Enterprise Security Score, which was allegedly developed "in furtherance of" the intellectual property acquired from QuadMetrics. Id. at ¶19. PCI-U has allegedly accused FICO of using PCI-U's confidential information to develop and deploy FICO's cyber threat analytics and the FICO Enterprise Security Score analytic. Id. at ¶21. FICO denies PCI-U's allegations. Id. at ¶22.

Based upon the foregoing, FICO seeks a declaration of the parties' respective rights under the NDA. Specifically, FICO seeks a declaration that: FICO was and continues to be lawfully entitled to develop cyber threat analytics, cyber-risk assessment software, and acquire companies such as QuadMetrics notwithstanding the joint-marketing discussions between FICO and PCI-U; FICO did not violate the NDA and did not use confidential information furnished by PCI-U; FICO has had and continues to have the right to engage in its lawful business activities, including the development and marketing of cyber threat analytics and the FICO Enterprise Security Score; and the cyber threat analytics and FCO Enterprise Security Score owned by FICO are unrelated to anything discussed or disclosed by PCI-U to FICO. FICO also asserts a claim for breach of the

NDA based upon PCI-U's alleged failure to return confidential information, including the Power Point presentation slides detailing FICO analytics and data.

Subject matter jurisdiction is predicated on 28 U.S.C. §1332. Id. at ¶6. Venue is predicated on 28 U.S.C. Section 1391(b) because the NDA was allegedly "made" in this district and the events giving rise to this action allegedly occurred in this district. Id. at ¶5.

B. Georgia Actions: PCI-U v. FICO

Three weeks prior to the filing of the instant action, on May 18, 2017, PCI-U filed suit against FICO in the Northern District of Georgia, asserting violations of Georgia laws governing breach of contract, fraud, unjust enrichment, promissory estoppel, quantum meruit, misappropriation of trade secrets and negligent misrepresentation, all of which were predicated on the NDA and the parties' joint venture. See PCI-U v. FICO, No. 17-1809 ELR (N.D. Ga. 2017). A week later, the Georgia court issued an order directing PCI-U to file a notice indicating the citizenship of its members. In response, PCI-U submitted a notice indicating that its two members are Georgia residents and asserting that the court therefore had diversity jurisdiction. On June 6, 2017, the Georgia court dismissed the action without prejudice because PCI-U's notice, although identifying the residence of its members, was insufficient to establish the citizenship of its members for purposes of establishing diversity jurisdiction. Two days later, FICO filed the instant action in California for breach of the NDA and declaratory relief.

Thereafter on June 13, 2017, PCI-U renewed its suit in Georgia state court. On July 14, 2017, FICO removed the action to federal court invoking diversity jurisdiction. See PCI-U v. FICO, No. 17-2650 ELR (N.D. Ga. 2017). FICO filed a motion to dismiss for lack of personal jurisdiction or in the alternative to transfer the action to this district. FICO's motion is fully briefed and remains under submission with the Georgia district court.

### III. DISCUSSION

A. Specific Personal Jurisdiction

Rule 12(b)(2), Fed.R.Civ.P., provides that a court may dismiss a claim for lack of personal jurisdiction. Where, as here, the parties support their respective positions on personal jurisdiction with affidavits, the plaintiff must make a *prima facie* showing of jurisdictional facts to defeat a

defendant's motion to dismiss. Data Disc, Inc. v. Systems Technology Associates, Inc., 557 F.2d 1280, 1285 (9th Cir. 1977). In assessing whether a plaintiff has made a *prima facie* showing, a plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant. Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995); Duffy v. Scott, 2008 WL 2168902 (N.D. Cal. 2009) (citing Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1129 (9th Cir. 2003)). Unless directly contravened, plaintiff's version of facts is taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in plaintiff's favor. Harris Rutsky & Co. Ins. Services, Inc., 328 F.3d at 1129.

"Whether there is a basis for the exercise of personal jurisdiction in a diversity of citizenship case depends upon two considerations: (1) whether a state statute potentially confers personal jurisdiction over the nonresident defendant, and (2) whether the exercise of jurisdiction accords with federal constitutional principles of due process." Congoleum Corp. v. DLW Aktiengesellschaft, 729 F.2d 1240, 1241 (9th Cir. 1984). California's statutory limitation on personal jurisdiction is co-extensive with the outer limits of due process. Sher v. Johnson, 911 F.2d 1357, 1361 (9th Cir. 1990); Cal. Code Civ. Proc. § 410.10. Accordingly, the jurisdictional inquiries under federal due process and California law merge into a single analysis. See Rano v. Sipa Press, Inc., 987 F.2d 580, 587 (9th Cir. 1993).

Due process permits the exercise of jurisdiction if a court has either general or specific jurisdiction over a nonresident defendant. See Sher, 911 F.2d at 1361. "General jurisdiction applies where a defendant's activities in the state are 'substantial' or 'continuous and systematic,' even if the cause of action is unrelated to those activities." Id. (citing Data Disc, Inc. v. Sys. Tech. Assocs., Inc., 557 F.2d 1280, 1287 (9th Cir. 1977)). "Where general jurisdiction is inappropriate, a court may still exercise specific jurisdiction if the defendant has sufficient contacts with the forum state in relation to the cause of action." Id.

Personal jurisdiction is properly exercised when the defendant has "certain minimal contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Data Disc, 557 F.2d at 1287 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1977); see Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476

5

(1985). The Ninth Circuit employs a three-part test to determine whether specific jurisdiction exists: (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or a resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004). "The plaintiff bears the burden of satisfying the first two prongs of the test." Id. "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." Id. But if the plaintiff succeeds on the first two prongs, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." Id. (citing Burger King Corp., 471 U.S. at 476-78).

With respect to the first factor, purposeful availment, FICO alleges that PCI-U solicited FICO's California representatives and proposed a business opportunity; that PCI-U entered into a contract with FICO that FICO negotiated from and executed in California; the contract necessarily required FICO to perform its contractual obligations from its operations in California; and that PCI-U met with FICO at is offices in California in a face-to-face meeting to define the joint business opportunity the parties were exploring. See Decl. of James Woodward at ¶¶10-14, 18-20.

In contrast, PCI-U asserts that the business venture giving rise to the NDA was first discussed at an in-person meeting between PCI-U founder Charles Hoff and FICO employee Scott Zoldi in Florida, not California. Id. at ¶12. According to PCI-U, the NDA was drafted by PCI-U in Georgia, negotiated by PCI-U in Georgia and executed by PCI-U in Georgia. Id. at ¶14. Further PCI-U asserts that the information disclosed by PCI-U to FICO pursuant to the NDA was created in Georgia and is located in Georgia. Id. at ¶23. PCI-U acknowledges, however, that a representative travelled to California for one meeting. Id. at ¶24. PCI-U asserts that it met with a single PCI-U employee, Doug Clare, and the meeting lasted only a few hours. Id. at ¶25. PCI-U asserts that all other contact between the parties was via telephone and email. Id. at ¶26. PCI-U also asserts that the single trip to California "did not impose on PCI-U any obligation to perform

its duties in the venture in California. To the contrary, PCI-U performed all of its duties in the venture in Georgia, not California." Id. at ¶28.

FICO's allegations are meager. Nevertheless, they must be accepted as true at this stage in the proceedings. See Harris Rutsky & Co. Ins. Services, Inc., 328 F.3d at 1129. Accepting as true that PCI-U solicited FICO's California representatives, that FICO negotiated from and executed the NDA in California, that the contract necessarily required FICO to perform its contractual allegations in California, and that the parties met in California, FICO has sufficiently alleged that PCI-U purposefully availed itself of the privileges of conducting activities in the forum. The second factor is also met. FICO alleges that its claims directly relate to, and arise out of, the forum-related activities described above. As to the third factor, PCI-U has not carried its burden of presenting a "compelling case" that the exercise of jurisdiction would not be reasonable. Therefore, the Court concludes that FICO has made a *prima facie* showing of specific jurisdiction over PCI-U.

B. Venue

A court may transfer an action to another district where the action might have been brought for the convenience of the parties, the convenience of the witnesses, and in the interest of justice. 28 U.S.C. §1404(a). In determining whether to transfer an action pursuant to Section 1404(a), the court considers the following factors: (1) the plaintiff's choice of forum, (2) the convenience of the parties, (3) the convenience of the witnesses, (4) ease of access to the evidence, (5) familiarity of each forum with the applicable law, (6) feasibility of consideration of other claims, (7) any local interest in the controversy, and (8) the relative court congestion and time of trial in each forum. Barnes & Noble v. LSI Corp., 823 F.Supp.2d 980, 993 (N.D. Cal. 2011). "The burden is on the party seeking transfer to show that when these factors are applied, the balance of convenience clearly favors transfer." Alul v. American Honda Motor Company, Inc., No. 16-04384 JST, 2016 WL 9116934 (N.D. Cal. Dec. 7, 2016) (citing Commodity Futures Trading Comm'n v. Savage, 611 F.2d 270, 279 (9th Cir. 1979)). A transfer is not appropriate if the result is merely to shift the inconvenience from one party to another. Van Dusen v. Barrack, 376 U.S. 612, 645–46 (1964).

7

Here, the action might have been brought in the Northern District of Georgia where PCI-U is clearly subject to personal jurisdiction and venue is proper. Although FICO's choice of forum is a factor entitled to some weight, other factors weigh more heavily in favor of a transfer. The majority of witnesses with knowledge regarding FICO and PCI-U's claims and defenses are in Georgia, not California. In particular, PCI-U witness Charles Hoff, as well as representatives from Bluefin, TSYS and Pritchard & Jerden, who participated in proof of concept meetings, are located in Georgia. Hoff Decl. at ¶32. PCI-U represents that other sources of proof, including documents and inventory, are located in Georgia, not California. Id. at ¶31. By comparison, FICO identifies only two potential witnesses in California, Mr. Zoldi and Doug Clare. Decl. of James Woodward at ¶14.

With respect to the convenience of the parties, PCI-U asserts that it has virtually no activities this district. Relying on upon the declaration of founder and chief executive officer Charles Hoff, PCI-U represents that it does not have employees in California, does not own or lease property in California, has no customers in California and has no suppliers in California. See Hoff Decl. at ¶5. PCI-U also represents that it does not derive any income from customers in California and spends no money with business in California. Id. PCI-U represents that its only office is in Georgia and its only employees are in Georgia. Id. at ¶¶3, 7. PCI-U represents that it is not registered to do business in California, does not hold a business license in California and owns no financial accounts in California. Id. at ¶8. Under these circumstances, PCI-U would be burdened by having to defend the case in this district.

In comparison, FICO has not established that it would be significantly inconvenienced by a transfer of this action to the Northern District of Georgia. FICO is a large, global company with offices across the United States and has a far more substantial presence in Georgia than PCI-U has in California. Although FICO does not own, rent or lease any real property in Georgia, FICO has a significant number of clients in Georgia. Decl. of James Woodward at ¶7. FICO also has forty individuals in Georgia working as employees or independent contractors. In an attempt to minimize its presence in Georgia, the Vice President of FICO's Legal Department represents that "less than 9% of its revenues are generated in that state." Id. That is a significant sum, however,

8

considering FICO's 2016 revenue was in excess of $800 million. Hoff Decl. at ¶10. Therefore, transferring this case to Georgia will not result in merely shifting inconveniences from PCI-U to FICO.

Finally, the interests of justice weigh in favor of transfer. The Court is troubled by the obvious waste of the parties' resources and the judiciaries' very limited resources caused by the two cases being litigated in two different courts on opposite sides of the country. Although FICO's true motives are unknown, it is self-evident that FICO filed the instant action in response to PCI-U's first-filed suit, which strongly suggests forum shopping. The Federal Rules of Civil Procedure should not be invoked for tactical advantage, but instead are to be construed, administered and employed by the parties "to secure the just, speedy and inexpensive determination of every action." Fed.R.Civ.P. 1. Transferring this action to Georgia will promote the just, speedy and inexpensive determination of the parties' competing claims, as well as promote judicial economy.

## IV.  CONCLUSION

For the reasons set forth above, PCI-U's motion to dismiss for lack of personal jurisdiction is DENIED. PCI-U's motion to transfer pursuant to 28 U.S.C. §1404(a) is GRANTED.

THE CLERK OF COURT is directed to transfer this action to the Northern District of Georgia.

**IT IS SO ORDERED.**

Dated: October 30, 2017

_____
EDWARD J. DAVILA
United States District Judge